476 F.2d 687
 Fed. Sec. L. Rep. P 93,814, 1973-1 Trade Cases 74,403
 GULF & WESTERN INDUSTRIES, INC., Plaintiff-Appellant,
v.
The GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., Defendant
and Third-Party Plaintiff-Appellee,
v.
Charles G. BLUHDORN, Third-Party Defendant-Appellant and
Kidder, Peabody & Co., Inc., Third-Party Defendant.
 Docket No. 73-1223.
 United States Court of Appeals,
Second Circuit.
 Argued March 8, 1973.
Decided March 12, 1973.
 
 Whitney North Seymour, New York City (William J. Manning, John A. Guzzetta, Melvyn L. Cantor, George H. Hempstead, III, Cynthia M. Cohen, Patrick H. Barth, and Simpson, Thacher & Bartlett, New York City, on the brief), for plaintiff-appellant Gulf & Western Industries, Inc., and third party defendant-appellant Charles G. Bluhdorn.
 Denis McInerney, New York City (Raymond L. Falls, Jr., William T. Lifland, Henry G. Bisgaier, Allen S. Joslyn, Charles Platto, David A. Mead, and Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, on the brief), for defendant and third party plaintiff-appellee The Great Atlantic & Pacific Tea Co., Inc.
 Robert F. Ambrose, Morton E. Grosz, Gerald A. Novack and Barrett, Smith, Schapiro & Simon, New York City, for The Josephine H. McIntosh Foundation, Incorporated, amicus curiae.
 George D. Reycraft, Eugene J. Leff, Boaz M. Shattan, Jr., and Cadwalader, Wickersham & Taft, New York City, for Neuberger & Berman, amicus curiae.
 Fred Lowenschuss Associates, Philadelphia, Pa., for Fred Lowenschuss Associates Pension Plan and Tendering Shareholders of A&P, amicus curiae.
 Before LUMBARD and TIMBERS, Circuit Judges, and WYZANSKI, District Judge.a
 TIMBERS, Circuit Judge:
 
 
 1
 The issues before us on this appeal by appellants Gulf & Western Industries, Inc. (G&W) and Charles G. Bluhdorn, the chairman of the board, chief executive officer and largest stockholder of G&W, arise from a motion brought on by order to show cause in the District Court for the Southern District of New York before Kevin T. Duffy, District Judge, by The Great Atlantic & Pacific Tea Company. Inc. (A&P) for a preliminary injunction.[1] A&P's motion sought to enjoin consummation of a tender offer by G&W to purchase 3,750,000 shares of the common stock of A&P. The motion alleged that G&W's proposed acquisition of A&P stock would violate Section 1 of the Sherman Act, 15 U.S.C. Sec. 1 (1970), and Section 7 of the Clayton Act, 15 U.S.C. Sec. 18 (1970); and that G&W's tender offer was in violation of Sections 14(d) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. Secs. 78n(d) and (e) (1970), and of Rule 14d-1 promulgated under the 1934 Act, 17 C.F.R. Sec. 240.14d-1 (1972).
 
 
 2
 G&W's tender offer was announced February 1, 1973. Judge Duffy on February 6 signed an order to show cause bringing on A&P's preliminary injunction motion for hearing on February 9. He heard the motion that day. On February 13, he filed a 21 page opinion granting the motion and on the same day entered a preliminary injunction enjoining consummation of the tender offer. On February 20, we granted appellants' motion to expedite their appeal from Judge Duffy's order. We heard the appeal on March 8.
 
 
 3
 For the reasons stated below, we affirm the preliminary injunction enjoining consummation of the tender offer.
 
 I.
 FACTS AND PRIOR PROCEEDINGS
 
 4
 G&W is a Delaware corporation. Its principal place of business is in New York City. It is the seventy-fourth largest industrial corporation in the United States. Its sales in 1972 totalled $1,669,671,000. It is one of the largest conglomerates, having acquired since 1957 approximately 100 previously independent companies. Bluhdorn has been at the helm of G&W since 1957.
 
 
 5
 A&P is a Maryland corporation. Its executive offices are in New York City. It operates one of the largest chains of retail supermarkets in the United States and is the largest such operator in the New York metropolitan area. Its sales in 1972 were approximately $6 billion.
 
 
 6
 At the time of the announcement of the tender offer which gave rise to the instant action, G&W was the owner of more than one million shares of A&P stock. A&P had 24,875,224 shares of common stock issued and outstanding. G&W thus had acquired more than 4 per cent of A&P's stock. Those shares had been purchased on the open market in the year preceding the announcement of the tender offer. They were held in street name by Kidder, Peabody & Co., a brokerage firm. A&P was unaware of this substantial G&W interest in its stock.
 
 
 7
 On February 1, 1973, G&W announced its intention to make a cash tender offer for the acquisition at $20 per share of an additional 3,750,000 shares of A&P stock (approximately 15 per cent).[2] As required by Rule 14d promulgated under the 1934 Act, G&W filed with the Securities and Exchange Commission a Schedule 13D on February 1. On the following day, the tender offer was communicated to the public.
 
 
 8
 A&P's management reacted swiftly in opposition. On February 2, it issued a press release indicating A&P's intent to "vigorously oppose" the tender offer. The release stated that not only was the $20 per share offer "inadequate and not in the best interest of [A&P's] shareholders", but that "it would seem that the acquisition of a large block of A&P shares by Gulf & Western raises most serious questions under the antitrust laws." The press release was followed up the next day by a letter to A&P's shareholders. Included in the letter were summary statements and statistics indicating that A&P was in a "turnaround" situation and that the G&W offer, by its "inadequate" terms, was an attempt "to purchase at a cheap price the value [in terms of upward potential] that rightfully belongs to [the A&P shareholders]." The implication of possible antitrust liability stated in the initial press release was repeated in the letter to shareholders.
 
 
 9
 On February 5, G&W commenced the instant action against A&P in the district court, alleging that A&P had made false and misleading statements in its opposition to the tender offer, in violation of Sections 10(b), 14(d) and 14(e) of the 1934 Act. G&W, simultaneously with the commencement of its action, presented an order to show cause bringing on its motion for a preliminary injunction against A&P.[3] Also on February 5, A&P filed its answer, counterclaim and a third-party action against Bluhdorn and against Kidder, Peabody & Co., the dealer-manager for G&W's tender offer. A&P's counterclaim and its motion for a preliminary injunction alleged violations of the antitrust laws and the securities laws. Judge Duffy signed A&P's order to show cause on February 6 and made it returnable on February 9, together with G&W's order to show cause referred to above. He denied applications by both sides for temporary restraining orders.
 
 
 10
 With respect to the antitrust violations, A&P alleged probable foreclosure and anticompetitive effects, both horizontal and vertical. It also alleged likelihood of unlawful reciprocal dealing.
 
 
 11
 The horizontal allegations were based on Bluhdorn's interest in the Bohack Corporation, one of A&P's major competitors in the New York area. Bohack is the second largest operator of retail supermarkets in the New York area, A&P being the largest. In the period immediately preceding the tender offer, Bluhdorn was the largest shareholder in Bohack, he was a member of its board of directors, and, with three other G&W officers on Bohack's board, Bluhdorn clearly had effective control of Bohack. On February 1, the four G&W directors of Bohack submitted their resignations from that board, and Bluhdorn placed all of his Bohack shares in a voting trust. Under the final terms of that trust, in the event the tender offer is consummated, Bluhdorn's shares in Bohack must be sold by the trustees within one year after the expiration date of the tender offer.[4]
 
 
 12
 In addition to the claim of horizontal market foreclosure, A&P alleged that success of the tender offer would create a probability of price-fixing between A&P and Bohack. This was based on the September 1972 denouncement by Bohack's president, Joseph Binder, of A&P's "WEO" (profit and price cutting) program as predatory and injurious to competition. That statement followed shortly after a private conversation between Bluhdorn and Binder. Binder, in addition, was named one of the two trustees of the voting trust.
 
 
 13
 The basis of A&P's vertical claim is that G&W, among its myriad conglomerate holdings, has a number of companies that deal in products of which A&P is a purchaser. A&P alleges the "potential exclusion of other suppliers of A&P if G&W affiliates are able to provide the same products or services on equal terms."[5] The scope of such vertical foreclosure was alleged to be upwards of $100 million. A&P also alleged the likelihood of unlawful reciprocity, in that A&P suppliers might be expected to direct their purchasers toward G&W affiliates in the hope of increasing sales to A&P. G&W's main response to the vertical and reciprocal charges was evidence of established corporate policy against such practices.
 
 
 14
 The alleged securities law violations generally charged G&W with omissions from the tender offer of material facts in contravention of Sections 14(e) and 14(d) of the 1934 Act. As summarized by the district court, the Section 14(e) claim was as follows:
 
 
 15
 "[T]hat the published tender offer and Schedule 13D filed with the Securities and Exchange Commission by G&W, omitted certain material facts in that they failed to disclose G&W's intention to acquire dominance of the A&P; that it failed to disclose that Bohack was the largest competitor of A&P in the New York City metropolitan area; and that Bluhdorn had effective control of Bohack; it failed to disclose the existence of a consent decree between Bohack and the Federal Trade Commission; and it failed to adequately describe G&W's business, including, in particular, the areas in which G&W controls companies producing products which are actual or potential suppliers of A&P."
 
 
 16
 The Section 14(d) charge alleged a failure by G&W to file a Schedule 13D in advance of its pre-tender offer purchases. A&P asserted that during the course of those purchases G&W had "formed the intention and embarked on a program to acquire more than 5% of the outstanding common stock of A&P."After approximately two days of depositions,[6] the district court heard on the same day the motions for preliminary injunctions brought on by G&W and A&P, respectively. The record before the court consisted of the testimony of three witnesses,[7] depositions, affidavits and documentary exhibits. Four days after the hearing, the court denied G&W's motion for a preliminary injunction, but granted A&P's motion for a preliminary injunction against G&W and Bluhdorn.[8] The only appeal before us is from the order granting A&P's motion.
 
 
 17
 The essential question before us on this appeal is whether the record supports the district court's order which granted a preliminary injunction enjoining consummation of the tender offer. We hold that it does.
 
 II.
 PRELIMINARY INJUNCTION STANDARD
 
 18
 We repeatedly have held that the two-fold requirement for a preliminary injunction is a demonstration of probability of success on the merits and a showing that irreparable harm will result if such relief is denied.
 
 
 19
 Recently we have emphasized the importance of demonstrating on a preliminary injunction motion the presence of serious questions going to the merits which warrant further investigation and trial. For example, in Stark v. New York Stock Exchange, 466 F.2d 743 (2 Cir. 1972), we recently stated:
 
 
 20
 "Appellants assumed the burden of demonstrating either a combination of probable success and the possibility of irreparable injury or that they had raised serious questions going to the merits and that the balance of hardships tipped sharply in their favor." 466 F.2d at 744.
 
 
 21
 And in Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2 Cir.), cert. denied, 394 U.S. 999 (1969), the standard which we find particularly applicable here was set forth as follows:
 
 
 22
 "The purpose of a preliminary injunction is to maintain the status quo pending a final determination of the merits . . . . It is an extraordinary remedy, and will not be granted except upon a clear showing of probable success and possible irreparable injury (emphasis that of the Court) . . . . However, 'the burden [of showing probable success] is less where the balance of hardships tips decidedly toward the party requesting the temporary relief.' Dino De Laurentiis Cinematografica, S. p. A. v. D-150, Inc., 366 F.2d 373, 375 (2 Cir. 1966). In such a case, the moving party may obtain a preliminary injunction if he has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation . Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 205 (2 Cir. 1966); Dino De Laurentiis Cinematografica, S. p. A. v. D-150, Inc., supra; Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2 Cir. 1953)." (emphasis added) (some citations omitted). 405 F.2d at 323.
 
 
 23
 Moreover, in government antitrust actions involving alleged Clayton Act violations, a "balancing of the equities-in terms of injury to the public interest if an injunction were denied, as against injury to the defendants if it were granted-is a relevant factor, once the probability of success standard has been met, in deciding whether to deny or grant injunctive relief." United States v. International Telephone & Telegraph Corp., 306 F.Supp. 766, 797 n. 95 (D. Conn.1969), appeal dismissed, 404 U.S. 801 (1972), and cases there cited. In the instant case, the magnitude and farreaching consequences of the alleged violations of the antitrust and securities laws are such that, in our view, the public interest requires the application of a like standard.
 
 
 24
 With this standard in mind, we turn directly to a consideration of the substantiality of the alleged violations of the antitrust and securities laws, and the probability of A&P's success on the merits on such claims after trial; and then, depending upon our conclusions on that issue, we shall consider the balance of equities as between the parties, keeping foremost in mind the paramount public interest.
 
 III.
 PROBABILITY OF SUCCESS ON THE MERITS
 
 25
 (A) Claims of Antitrust Law Violations
 
 
 26
 The antitrust claims of A&P are based on Section 7 of the Clayton Act which provides in relevant part:
 
 
 27
 "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock . . . of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."
 
 
 28
 At this stage of the litigation, we of course need not decide whether A&P has proven a violation of that provision. We are required, however, to decide whether the evidence at the hearing below demonstrated that A&P's allegations were of sufficient substance to warrant an examination of the other requirements necessary to the grant of preliminary injunctive relief.
 
 
 29
 G&W's primary defense to the Section 7 claims is that the evidence demonstrated that its tender offer comes within the proviso to that section-to wit, that its offer to purchase A&P stock is "solely for investment and not . . . to bring about . . . the substantial lessening of competition." Section 7, p 3. In arguing for a broad definition of "investment", G&W relies on Pennsylvania R.R. Co. v. ICC, 66 F.2d 37 (3 Cir. 1933), aff'd per curiam by equally divided Court, 291 U.S. 651 (1934). In our view, however, that case says no more than that the court's attention should be focused less on whether the purchase constitutes an "investment" than on whether the effect (indeed at this juncture the reasonably likely effect) is substantially to lessen competition.
 
 
 30
 G&W next contends that each of the potential anticompetitive effects claimed by A&P depend on the attainment of control by G&W. Put another way, the argument is that, without control over the policies and practices of A&P, the feared horizontal, vertical and reciprocal practices are no more likely to occur than they were with G&W entirely out of the A&P corporate picture.
 
 
 31
 We reject that contention both on the facts and on the law. Factually, it must be remembered that the reciprocal allegations relate to the actions of third parties in this case, suppliers of A&P who might determine that it would be in their best interest to purchase whenever possible from G&W companies. It is the third-parties' perception of what course would be to their best advantage that may give rise to reciprocal dealing by creating a market structure conducive to reciprocity or reciprocity effect. Particularly with companies of the size and power of those here involved, "the actual or potential implementation of coercive reciprocity, which presupposes the existence of leverage, is inimical to a competitive economic society." United States v. General Dynamics Corp., 258 F.Supp. 36, 59 (S.D.N.Y.1966).
 
 
 32
 Furthermore, with respect to all the antitrust claims, we are satisfied that the record demonstrates a substantial likelihood that G&W will seek to obtain control of A&P and that it has the potential to attain that goal.[9] Our views in this regard are more fully set forth in our discussion of the securities law claims below.
 
 
 33
 As a matter of law, we are not aware of any decision that requires numerical control in order to establish an antitrust violation. Several cases have held to the contrary. E.g. American Crystal Sugar Co. v. Cuban-American Sugar Co., 152 F.Supp. 387, 393 (S.D. N.Y.1957), aff'd, 259 F.2d 524 (2 Cir. 1958); Hamilton Watch Co. v. Benrus Watch Co., 114 F.Supp. 307, 317 (D. Conn.), aff'd, 206 F.2d 738 (2 Cir. 1953).[10] Rather, the critical question is whether the probable future effect of the transaction will be substantially to lessen competition. Brown Shoe Co. v. United States, 370 U.S. 294, 332 (1962); United States v. Von's Grocery Co., 384 U.S. 270, 278 (1966).
 
 
 34
 In assessing that issue, we turn now to the allegations of vertical integration. In discussing the vertical claim by way of illustration, we do not indicate any view as to the relative strength of that claim vis-a-vis the other antitrust claims asserted by A&P.
 
 
 35
 The leading case in the vertical area of course is Brown Shoe Co. v. United States, supra, in which the Supreme Court held unlawful under Section 7 a merger between a leading shoe manufacturer and a leading shoe retailer. We find the present case sufficiently similar to that one to permit a conclusion that A&P has shown a reasonable likelihood of success on the vertical claim at the trial on the merits.
 
 
 36
 Passing over the essential, but here uncontested, definition of the relevant product and geographical markets, the issue centers on the probable effect of the acquisition by G&W of over 19% of the A&P shares. As in Brown Shoe, "[a] most important . . . factor to examine is the very nature and purpose of the arrangement." 370 U.S. at 329. Here, the record before us supports the conclusion that the purpose of the acquisition is very likely to provide a basis for eventual control of A&P by G&W. The record further supports the conclusion that the nature of the post-acquisition arrangement will be such as to give G&W a substantial advantage over its competitors in the sale to A&P of products which the latter either uses or retails and which G&W can supply.
 
 
 37
 In support of those conclusions, the record here discloses many of the same troublesome ingredients that led to the Brown Shoe decision: the tender offer here "involve[s] neither small companies nor failing companies",[11] 370 U.S. at 331; because of the absolute size of the firms involved "in this industry, no merger between a manufacturer and an independent retailer could involve a larger potential market foreclosure", 370 U.S. at 331-32; and the trend toward concentration of the industry has been well-documented,[12] 370 U.S. at 332. Furthermore, in light of the present production capacity of A&P and the great possibilities for expansion, the potential foreclosure is well above the "de minimis" level.
 
 
 38
 The import of these views, once again, is not that A&P is necessarily correct in its allegations of a vertical integration in violation of the antitrust laws. Rather, we hold only that a sufficient likelihood of success on that claim has been demonstrated to satisfy A&P's burden on the motion for preliminary injunction.
 
 
 39
 (B) Claims of Securities Law Violations
 
 
 40
 A&P claims that G&W has violated Section 14(e) of the Securities Exchange Act of 1934[13] by omitting certain material facts from its tender offer announcement: (1) G&W's intention to acquire a controlling position in A&P or at least to exercise influence over A&P's management and policies; and (2) G&W's holdings in other companies which indicate that G&W's acquisition of A&P stock is likely to result in violations of the antitrust laws by both companies. The question here is whether, on the basis of the evidence presented below, it appears that A&P stands a strong chance of proving at trial that G&W's failure to disclose these facts in its announcement of the tender offer violated Sec. 14(e). We hold that A&P has demonstrated a probability of success on the merits with regard to its Sec. 14(e) claim.
 
 
 41
 While Sec. 14(e) is a relatively new statute,[14] in general it tracks the language of Rule 10b-5, 17 C.F.R. Sec. 240.10b-5 (1972), except that Sec. 14(e) applies to tender offers rather than the purchase or sale of securities. The elements of an action for injunctive relief are essentially the same under Sec. 14(e) as under Rule 10b-5. See Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 362 (2 Cir. 1973), slip op. 4897, 4929-30 (March 16, 1973). With respect to A&P's Sec. 14(e) claim, in order to succeed at the trial on the merits, A&P need only establish that the omissions were material and that "'any of the stockholders who tendered their shares would probably not have tendered their shares' if the alleged violations had not occurred." Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 948 (2 Cir. 1969), quoting Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840, 843 (2 Cir. 1967).
 
 
 42
 There can be no doubt that if G&W intended, when it announced its tender offer, to take control of A&P or to participate extensively in its management, its failure to disclose that intention constituted a violation of Sec. 14(e). Cf. Susquehanna Corp. v. Pan American Sulphur Co., 423 F.2d 1075, 1082-86 (5 Cir. 1970). Any of the tendering shareholders who did not tender all of their A&P holdings to G&W would be influenced in their decision whether or not to tender by the fact that G&W would eventually control or substantially influence the operations of A&P.[15] For example, such shareholders might be disinclined to facilitate G&W's takeover attempt, if it were to create a substantial risk that their remaining holdings in A&P would suffer a decline in value, because present management would be replaced by less efficient G&W management. On the other hand, they might want to retain all their shares because of their belief that the incoming management team would be superior. In short, G&W's intentions with regard to directing A&P's policies and operations are of such significance that the tendering shareholders would have weighed them in their decision whether or not to sell. Moore v. Greatamerica Corp., 274 F.Supp. 490, 492-93 (N.D.Ohio 1967).[16]
 
 
 43
 Considerable evidence was adduced at the hearing which indicates that G&W purchased A&P stock not for the purpose of investment but with a view to exercising influence or control. Proof of such intent obviously is difficult, particularly where only limited discovery is possible, as in the case below due to the time limitations. Nevertheless, the Bluhdorn deposition, as well as other evidence adduced, strongly indicates that such intent was present. G&W has a well-established practice of eventually acquiring firms in which it initially purchased only a small percentage of the outstanding shares. It is likely that this acquisition practice will be applied to A&P, especially since G&W's present commitment to purchase A&P shares represents the largest single commitment in G&W's history.[17] In addition, A&P is such an "overpriced" and "rundown" corporation, in the opinion of Bluhdorn, that it could not possibly succeed as an "investment". But since in Bluhdorn's view much of A&P's difficulty is attributable to its present management, it is the type of company that probably would make a sound acquisition with a replacement of management. Bluhdorn indeed remarked that his "Bohack management team" possessed the skills and experience necessary to cause a turnaround of A&P. These facts and circumstances indicate that A&P has a probability of success in proving at trial that G&W had an intention to obtain control of A&P or to influence substantially its management, which intentions it failed to disclose in violation of Sec. 14(e).[18]
 
 
 44
 It also appears that G&W omitted to state certain material facts indicating that there are substantial antitrust obstacles to G&W's purchasing a large portion of A&P's shares. As stated above, Bluhdorn's ownership of a controlling interest in Bohack, combined with G&W's large purchases of A&P stock, creates a strong likelihood of antitrust litigation to prevent unlawful foreclosure of competition in the supermarket business. G&W also owns or controls several companies which are actual or potential suppliers of A&P, and apparently has plans to expand such operations so as to take advantage of its shareholder position in A&P. We have discussed above the exposure of G&W to potential antitrust liability for engaging in unlawful vertical integration.
 
 
 45
 The facts that, at the time it announced its tender offer, an antitrust action had not been commenced against G&W, and that its liability was uncertain, does not excuse G&W's failure to disclose all these relevant circumstances so that A&P shareholders could weigh them in reaching their decision whether or not to tender their shares. As we said in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2 Cir. 1968) (en banc), cert. denied sub nom. Kline v. SEC, 394 U.S. 976 (1969), the disclosure requirements of the securities laws require "nothing more than the disclosure of basic facts so that outsiders may draw upon their own evaluative experience in reaching their own investment decisions with knowledge equal to that of the insiders." Those "basic facts" bearing upon G&W's possible liability for antitrust violations were of obvious concern to those A&P shareholders who retained part of their holdings.
 
 
 46
 We hold that the record before the district court demonstrated a probability of A&P's success on the merits on its claims of securities law violations.IV.
 
 BALANCING THE EQUITIES
 
 47
 Having determined that A&P has established a probability of success on the merits at trial on at least some of its claims, we turn now to a consideration of the balancing of the equities.
 
 
 48
 (A) Interest of A&P
 
 
 49
 The district court's opinion indicates that above all else its conclusion was based on its perception of the harm that would accrue to A&P in the absence of preliminary relief:
 
 
 50
 "[T]o permit the tender offer to go forward could have serious detrimental effects on A&P. It is possible that A&P would be involved in a violation of the antitrust laws. There is testimony in the record that the executives of A&P have already suffered a tremendous downgrading of morale with just the suggestion that the company was about to be taken over by G&W. Moreover, if this Court permitted the tender offer to be consummated and at some later date were to find the violations charged by A&P, it would be almost impossible to unravel the situation."
 
 
 51
 We agree. Moreover, considering the entire record, that is a finding that certainly cannot be said to be clearly erroneous.
 
 
 52
 (B) Interest of G&W
 
 
 53
 The only interest of G&W urged upon us that bears on the propriety of the preliminary injunction is that G&W has the right to invest on behalf of its shareholders at such time as it deems ripe and profitable. Certainly this is one factor to be considered and we have done so. But we think that it is important, in weighing this interest, to bear in mind that (1) the interest urged can only be so where a lawful acquisition or investment is involved; and (2) the preliminary relief granted is not nearly as final as G&W urges. Here, the probability that the "investment" is unlawful, as shown above, is sufficiently strong to call into serious question G&W's right to proceed with the tender offer. Further, if after trial on the merits G&W is vindicated, it will not be foreclosed from renewing its tender offer.[19] While that may be said to be something less than a full blessing for G&W, its right to act at will is not absolute. In a case of strong likelihood of unlawfulness, that right must be at least temporarily subordinated.
 
 
 54
 (C) Interest of A&P Shareholders
 
 
 55
 In Butler Aviation International, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842, 845 (2 Cir. 1970), we said:
 
 
 56
 "While courts should vigorously enforce the policy of honesty and fair dealing prescribed by federal securities legislation, they must guard against the risk that, at the instance of incumbent management, they may be frustrating informed stockholders from doing what the latter want."
 
 
 57
 We have given careful attention to that consideration here. What we said in Butler Aviation, however, clearly presupposes that the shareholders are indeed informed-a premise which we have indicated above has been drawn into serious doubt in this case. A&P shareholders, moreover, like G&W, have no inherent right to proceed with an unlawful tender; a requirement of lawfulness is included by implication in every tender offer.
 
 
 58
 (D) Interest of the Public
 
 
 59
 Finally, in balancing the equities, the public interest must be considered. If G&W is in fact proceeding in violation of the antitrust and securities laws, a preliminary injunction would serve the public interest as much as A&P's private interests. In this regard, by asserting these claims, A&P is assuming a dual role, including that of a private attorney general. Since it is impossible as a practical matter for the government to seek out and prosecute every important violation of laws designed to protect the public in the aggregate, private actions brought by members of the public in their capacities as investors or competitors, which incidentally benefit the general public interest, perform a vital public service. As the Supreme Court said in J. I. Case Co. v. Borak, 377 U.S. 426, 432 (1964), private actions provide "a necessary supplement" to actions by the government and "the possibility of civil damages or injunctive relief serves as a most effective weapon in the enforcement" of laws designed to protect the public interest. Therefore, as in actions brought by the government, doubts as to whether an injunction sought is necessary to safeguard the public interest-when the public interest involved is as clear, pervasive and vital as the record here demonstrates-should be resolved in favor of granting the injunction. See United States v. First National City Bank, 379 U.S. 378, 383 (1965); Mitchell v. Pidcock, 299 F.2d 281, 287 (5 Cir. 1962).
 
 
 60
 In our view, the present case involves precisely that strong showing of public interest which we hold is paramount.
 
 
 61
 Upon balancing the equities in accordance with the standard stated above, we hold that the record clearly supports the district court's order which granted a preliminary injunction enjoining consummation of the tender offer.
 
 
 62
 Under all the circumstances, we suggest to the district court that it expedite further proceedings in this case, as it so commendably has done to date, with a view to the earliest possible date for trial on the merits consistent with the rights of the parties. We are confident that counsel will fully cooperate to that end.
 
 
 63
 Finally, we express our appreciation to able counsel for all parties for their excellent briefs and oral arguments which have facilitated our task on this expedited appeal.
 
 
 64
 Affirmed.
 
 
 
 a
 Senior District Judge of the District of Massachusetts, sitting by designation
 
 
 [1]
 We set forth below a more complete statement of the litigation sequence that preceded this motion, including the plenary action out of which the motion arose
 
 
 [2]
 The tender offer reserved to G&W the right to purchase any shares tendered in excess of that amount. At the hearing in the district court, however, G&W informed the court that it would accept no more than 3,750,000. G&W accordingly has returned all shares tendered in excess of that amount
 
 
 [3]
 G&W's motion claimed that A&P had violated the securities laws by false and misleading statements in both the February 2 press release and the February 3 letter to shareholders. The district court rejected G&W's claims, based on the view "that the alleged omissions were not material omissions and that the plaintiff has failed to show a reasonable expectation of success on the trial of the issues so as to cause this Court to issue the preliminary injnction sought by G&W. Nor does this Court find these issues so difficult and doubtful as to tip the balance of hardship toward G&W and thus warrant the issuance of injunction . . . ." G&W has not appealed from the denial of its motion for a preliminary injunction
 
 
 [4]
 The voting trust as originally drafted required disposal of the shares "[i]f G&W becomes the controlling shareholder of A&P", defined as either being the "largest single holder of common stock of A&P" or having "a majority of the members of the Board of Directors of A&P . . . designees of G&W." (emphasis added)
 
 
 [5]
 The specific items involved include paper goods, produce and meat, refrigeration equipment, and cigars, each of which is a category of goods which A&P purchases and G&W can supply. It is further alleged that various financial services offered by G&W, not currently utilized by A&P, present further vertical foreclosure potential
 
 
 [6]
 The following depositions were taken, each of which was received in evidence without objection at the preliminary injunction hearing: Charles G. Bluhdorn (Chairman of the Board and Chief Executive Officer of G&W) (by A&P); Joel Dolkart (General Counsel and Director of G&W) (by A&P); Ralph D, DeNunzio (Chairman of the Executive Committee of Kidder, Peabody & Co.) (by A&P); William J. Kane (Chairman of the Board and Chief Executive Officer of A&P); (by G&W); and Byron Jay (former Chief Executive Officer of A&P, and Trustee of the Hartford Foundation) (by G&W)
 
 
 [7]
 G&W called no witnesses, except that it cross-examined M. Dean Potts (Comptroller of A&P) on his affidavit
 A&P called as witnesses William J. Kane, see note 6. supra; and John Guest, a member of the brokerage firm of Kuhn, Loeb & Co., who testified to a conversation with Bluhdorn concerning a proposed purchase of the Hartford Foundation's A&P shares.
 
 
 [8]
 The court denied that portion of A&P's motion which sought a preliminary injunction against Kidder Peabody on the ground that "[t]here is no showing that Kidder Peabody was acting as anything but a stockbroker for G&W. Apparently it had no knowledge of any possible wrongdoing by G&W and Bluhdorn." No issue is before us on this appeal regarding Kidder Peabody, since no appeal has been taken from the denial of A&P's motion for a preliminary injunction against it
 
 
 [9]
 G&W's argument that, aside from its asserted lack of intent, there is no possibility of gaining control is not supported by the record. That contention rests on the premise that the Hartford Foundation, and the various shareholding members of the Hartford family, together form a monolithic block with considerably more than 50% of the outstanding shares. The district court concluded that the evidence showed no block voting among the various Hartford interests. We agree
 At the argument of this appeal, moreover, we were informed that the Foundation was not unwilling to reduce its interest. Upon the announcement of the tender offer, the Foundation voted to tender some 1.5 million shares to G&W. On February 14, it actually did tender 500,000 shares, although these shares were returned by G&W due to the oversubscription of the tender offer at that time.
 We note further that under the provisions of Section 4943 of the Tax Reform Act of 1969, 26 U.S.C. Sec. 4943 (1970), the Hartford Foundation is in a position where divestment of a sizeable portion of its A&P holdings soon will be highly probable. In short, we find no basis in fact for the argument that the current dominance of the various Hartford interests precludes G&W control of A&P at some future date.
 
 
 [10]
 In Denver & Rio Grande Western R. R. Co. v. United States, 387 U.S. 485, 501 (1967), the Court held that, while the ICC's duty to consider anticompetitive effects of the acquisition of stock of a common carrier under Section 5 of the Interstate Commerce Act, 49 U.S.C. Sec. 5 (1970), "arises only after the threshold fact of control is established, [n]o such preliminary finding need be made to trigger the ICC's duty under the Clayton Act. A company need not acquire control of another company in order to violate the Clayton Act." See also United States v. E. I. duPont deNemours & Co., 353 U.S. 586 (1957)
 
 
 [11]
 While A&P's recent performance may be said to have been lackluster, the data provided in its own response to the tender offer negates any possible claim that it is "failing"
 
 
 [12]
 The FTC has found distinct trends toward concentration in both the food distribution and grocery products manufacturing industries. 1 CCH Trade Reg. Rep. p 4525, at 6904; p 4530 at 6908 (1971)
 
 
 [13]
 Section 14(e) reads in pertinent part:
 "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."
 
 
 [14]
 Our Court has had occasion to construe Sec. 14(e) on at least four previous occasions. Butler Aviation International, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842 (2 Cir. 1970); Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2 Cir. 1969), cert. denied, 400 U.S. 822 (1970); Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963 (2 Cir. 1969), cert. denied, 399 U.S. 909 (1970); Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (2 Cir. 1969). See Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 357 (2 Cir. 1973), slip op. 4897, 4920-59 (March 16, 1973)
 A&P's standing, as the target corporation of a tender offer, to bring suit under Sec. 14(e) for a preliminary injunction against G&W, the offeror, is clear. Butler Aviation International, Inc. v. Comprehensive Designers, Inc., supra, 425 F. 2d at 843 n. 1; Susquehanna Corp. v. Pan American Sulphur Co., 423 F.2d 1075 (5 Cir. 1970). See also Electronic Specialty Co. v. International Controls Corp., supra, 409 F.2d at 940-41, 944-46.
 
 
 [15]
 That there are shareholders in this situation is clear from the record. The Josephine H. McIntosh Foundation, for example, tendered only 200,000 of its total 1,100,000 shares of A&P common stock
 
 
 [16]
 Former SEC Chairman Cohen has made some especially relevant comments on the importance of disclosing an intended change of control:
 "Information about a potential change in control can be particularly essential to an informed decision. A change in control brings with it the possibility of different operating results and different investment results, or perhaps the possibility of realizing on a company's liquidation value. This may be either good, or bad, depending on the facts and circumstances involved. But no investor can reach a conclusion on the possible effects of a change in control until the facts are available to him." See Cohen, A Note On Takeover Bids and Corporate Purchases of Stock, 22 Business Lawyer 149, 151 (1966), quoted in, Moore v. Greatamerica Corp., supra, 274 F.Supp. at 493.
 
 
 [17]
 As additional basis for this inference (at least as of an earlier date), see note 4, supra
 
 
 [18]
 It appears that G&W also has failed to comply with the requirements of Section 14(d) of the 1934 Act and Regulations 14d-1 through 14d-4, 17 C.F.R. Secs. 240.14d-1 to 14d-4 (1972). Section 14(d) requires that a tender offer which will result in more than 5% ownership of the target company cannot be made until the offeror files a Schedule 13D with the Commission providing specified information. Item 4 on Schedule 13D in part requires that the following information be provided:
 "Item 4. Purpose of Transaction.
 State the purpose or purposes of the purchase or proposed purchase of securities of the issuer. If the purpose or one of the purposes of the purchase or proposed purchase is to acquire control of the business of the issuer, describe any plans of proposals which the purchasers may have to liquidate the issuer, to sell its assets or to merge it with any other persons, or to make any other major change in its business or corporate structure, . . . ."
 G&W did not supply such information-in violation of Sec. 14(d).
 
 
 [19]
 G&W argues that after April 3 the tendering shareholders have the right to withdraw their tendered shares, thereby effectively destroying the tender offer. Suffice it to note that the provision of the Williams Act referred to, 15 U.S.C. Sec. 78n(d)(5) (1970), merely gives shareholders the option of withdrawing; it says nothing about re-solicitation of those shares; and indeed it authorizes adding to the attractiveness of the tender offer. 15 U.S.C. Sec. 78n(d)(7)