**Rex C. CAUBLE**

v.

**W. Richard WHITE et al.**

**Civ. A. No. 73-744.**

United States District Court,
E. D. Louisiana.

June 14, 1973.

B. G. Minisman, Jr., Newfield & Minisman, Birmingham, Ala., Clifton S. Carl, Garrett, Carl & Roussel, New Orleans, La., for plaintiff.

H. Paul Simon and Robert L. Redfearn, Deutsch, Kerrigan & Stiles, New Orleans, La., for defendants.

## REASONS FOR JUDGMENT

R. BLAKE WEST, District Judge.

Fundamentally, this case involves a conflict arising out of the effort of a wealthy businessman to take over, by stock purchase, the control of a bank, and the efforts of those presently in control of the bank to prevent the takeover. As will be seen, neither side played the game according to the rules, and play was suspended. The rules in question are the provisions of the Securities and Exchange Act governing cash tender offers (15 U.S.C. §§ 78n(d)(1), 78n(d)(4) and 78n(e)) and the regulations promulgated thereunder.[1]

---

1. The Securities and Exchange Act was amended in 1968 to provide for regulation of tender offers. The amendment is known as the Williams amendment and is codified at 15 U.S.C. § 78n. The amendment provides for the formulation of rules to enforce the provisions of the act. Those promulgated with respect to tender offers for stock in banks are found in Title 12, Part 11 of the Code of Federal Regulations, particularly 12 C.F.R. § 11.5(*l*), 12 C.F.R. § 11.5(m), 12 C.F.R. § 11.47, and 12 C.F.R. § 11.53.

The matter came before the Court when both plaintiff, Rex Cauble, and defendants, First National Bank of Jefferson Parish and its president, W. Richard White, sought by way of motions for preliminary injunctions to halt what each side considered activities amounting to "dirty pool" by the other. As has been stated, since each side committed critical errors, equity and fairness required that the sides should be returned to the positions they occupied prior to the commission of the offsetting penalties, and for the following reasons the relief sought by each side was denied.

## BACKGROUND

The action started when plaintiff sought to make a cash tender offer to the bank's shareholders for the purchase of 150,000 shares of stock in the bank for the price of $41.00 per share. A cash tender offer is a method by which interested parties may seek to acquire large amounts of stock in a specified or "target" corporation. Such an offer involves the advertisement by the offeror of the terms of his offer, which advertisement is aimed at the shareholders of the target corporation, who may then tender their shares to the offeror.

Plaintiff cried "foul" when, in response to his allegedly valid offer, Mr. White, in his position as president of the bank, on the day of publication of the offer, sent a letter to all shareholders of the bank which quoted a baseless potential valuation of the bank stock much above the actual value or the tender offer price, which letter obviously was intended to discourage the tender of shares pursuant to the tender offer. Plaintiff further contended that the letter was not filed with the Comptroller of Currency along with certain disclosures of information as required by 12 C.F.R. § 11.5(m), and that the officers of the bank manipulated the market price of the bank stock so as to drive the pre-tender offer market price of $29.00—$33.00 per share up to the $41.00 tender offer price, thereby discouraging the tender of shares to plaintiff.

Seeking to require defendants to play by the rules, plaintiff sought an injunction, ordering (1) that a letter be sent to all shareholders correcting the error in valuation quoted in the letter from the bank president and also stating that the management of the bank had artificially inflated the market price of bank stock, (2) that the bank comply with the registration provisions of the Securities Act and the regulations pursuant to it with respect to management's opinion of tender offers, (3) that defendants be ordered to tender all shares of stock purchased by the bank or its officers or directors during the pendency of the tender offer to plaintiff at the tender offer price of $41.00 and (4) that all communications between bank and shareholders be subject to the approval of the Court.

Defendants denied the allegations of plaintiff's petition, and, in their turn, cried "foul" and counterclaimed against plaintiff, also seeking injunctive relief. Defendants contended that no injunction should issue in favor of plaintiff, due to plaintiff's own violations of the securities regulations. According to defendants, the advertisement of the tender offer made by plaintiff failed to state plaintiff's intention to obtain control of the bank and to make substantial changes in the bank's executive management, all in violation of 15 U.S.C. § 78n(e). Defendants sought (1) a dismissal of plaintiff's case, and (2) an injunction prohibiting plaintiff from acquiring further shares of the bank pursuant to the tender offer and declaring the tender offer null and void.

An evidentiary hearing was held on April 5, 1973, at which time the Court, bearing in mind that the purpose of the regulations governing tender offers is to provide protection for tender offerors, target corporations, and shareholders alike, and that the role of the Court in a matter of this nature is to balance the equities, concluded:

1. That plaintiff be required to file and publish an amended offer clearly stating his intention to obtain control of the bank and to replace management personnel, including defendant White;

2. That defendant White be required to correct the misleading letter previously sent to shareholders with respect to the potential valuation of the bank stock;

3. That shareholders who had tendered stock pursuant to the erroneous original offer be allowed an opportunity to withdraw shares so tendered following the publication of the revised offer.

## FACTS

### (a) Plaintiff's Errors

On March 12, 1972, plaintiff made a tender offer for 150,000 shares of $10.00 par value common stock of the First National Bank of Jefferson, the principal office of which is located in Gretna, Jefferson Parish, Louisiana. The offer price was $41.00 per share. The first announcement of the tender offer appeared in the March 12, 1973 editions of *The Daily Record* and the *States-Item*, and in subsequent editions of the *States-Item* and the *Times-Picayune*, all daily newspapers with wide circulation in Jefferson Parish. Prior to the public announcement of the tender offer, plaintiff filed an "F–11" disclosure form with the Comptroller of Currency in accordance with the provisions of 15 U.S. C. § 78n(d)(1),[2] 12 C.F.R. § 11.5(*l*),[3] and 12 C.F.R. § 11.47.[4]

2. 15 U.S.C. § 78n(d)(1) provides:

(d)(1) It shall be unlawful for any person, directly or indirectly, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, to make a tender offer for, or a request or invitation for tenders of, any class of any equity security which is registered pursuant to section 78*l* of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78*l*(g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 5 per centum of such class, unless at the time copies of the offer or request or invitation are first published or sent or given to security holders such person has filed with the Commission a statement containing such of the information specified in section 78m (d) of this title, and such additional information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. All requests or invitations for tenders or advertisements making a tender offer or requesting or inviting tenders of such a security shall be filed as a part of such statement and shall contain such of the information contained in such statement as the Commission may by rules and regulations prescribe. Copies of any additional material soliciting or requesting such tender offers subsequent to the initial solicitation or request shall contain such information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors, and shall be filed with the Commission not later than the time copies of such material are first published or sent or given to security holders. Copies of all statements, in the form in which such material is furnished to security holders and the Commission, shall be sent to the issuer not later than the date such material is first published or sent or given to any security holders.

3. 12 C.F.R. § 11.5(*l*) provides in pertinent part:

(1) Invitations for tender. (1) No person, directly or indirectly, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, shall make a tender offer for, or a request or invitation for tenders of, any class of any equity security, which is registered pursuant to section 12 of the Act, of a national bank or a bank operating under the Code of Law for the District of Columbia if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 5 percent of such class, unless, at the time copies of the offer or request or invitation are first published or sent or given to security holders, such person has filed with the Comptroller a statement containing the information and exhibits required by Form F–11.

4. See note 4 on page 1025.

With respect to the control of the corporation and plans for the bank following the tender offer, if successfully consummated, it was stated in the newspaper announcements, that,

"The purpose of the transaction is to acquire 150,000 of the 315,000 outstanding shares of the bank. *This is less than control.* However, there are no plans to liquidate, sell assets, or merge the Bank or otherwise make any major changes in its business or structure." (Emphasis supplied)

Upon sending of the letter from White to the shareholders and the occurrence of an alleged incident involving the bank's purchase of 378 shares of stock from an estate on March 12th, at the price of $30.00, plaintiff became extremely upset over what he considered the opponents' unfair game plan. On March 20, 1973, another F-11 form was filed with the Comptroller of Currency including a revised statement of the purpose of the transaction. This revised offer, which appeared in the press on March 21, 1973, stated:

"The purpose of this offer is to acquire 150,000 shares of the Bank's common stock. If Mr. Cauble purchases 150.000 shares of the Bank's stock pursuant to this Offer, he will not have acquired pursuant hereto a majority of the outstanding shares of

the Bank's stock, but such acquisition *may* result in Mr. Cauble being able to effectively control the Bank. If the offer is successful, Mr. Cauble intends to seek representation on the Board of Directors of the Bank and may seek to make changes in the executive management of the Bank. However, there are no plans to liquidate, sell assets, or merge the Bank or to otherwise make any major changes in its business or structure." (Emphasis supplied)

(2) If any material change occurs in the facts set forth in the statement required by subparagraph (1) of this paragraph, the person who filed such statement shall promptly file with the Comp-

It was clear from the testimony of Mr. Cauble that, while he knew at the time of both newspaper notices that 150,000 shares was not numerical control, he was virtually certain that a successful purchase of that number of shares would allow him effective control, and he intended that result. Neither notice made it clear that plaintiff's intention was to assume control of the bank.

Furthermore, although it was not so stated in either notice of the tender offer, it appeared from the testimony of Mr. Cauble and others that, while on the date of the original notice of the offer Cauble may not have had definite plans as to management changes, it was abundantly clear that at the time of the revised notice of March 21st, Cauble had determined that upon the purchase of the 150,000 shares, he would discharge Mr. White and other officers of the bank from their positions. Thus, both published notices were misleading in that in neither did plaintiff clearly state that it was his intention, through the stock acquisition definitely to take control of the bank with power to eject the management team of the bank, very particularly Mr. White.

(b) *Defendants' Errors*

On the morning of March 12th, upon learning of the proposed tender offer, defendant White caused the following letter to be sent to all shareholders of record on the bank's letterhead:

"March 12, 1973

Dear Stockholder:

Today in The Daily Record and also in the States-Item an offer to purchase 150,000 shares of First National Bank of Jefferson Parish, our bank stock, for a price of $41.00 net per share was quite a surprise to our management.

troller an amendment disclosing such change.

4. 12 C.F.R. § 11.47 provides the form and content of the "F-11" statement required by 12 C.F.R. § 11.5.

This offer to purchase was made by Rex C. Caubel (sic.), P. O. Box 980, Denton, Texas, 76201. The book value of our stock is now $41.00 per share and the realistic potential value of our stock, based on our earnings and the growth of our area, would be $100.00 per share.

We trust that you will take cognizance of the above information and act in your best interest.

Sincerely,
(Signed) W. Richard White
President"

The letter was sent without any prior consultation with the other officers or directors of the bank, and without any reference to expert opinion with regard to the actual or potential value of the stock. According to White, the $100.00 figure quoted as the "realistic potential value" of the stock was based only upon his hopeful estimate and was not the product of any expert opinion or inside knowledge. In the months preceding the tender offer, the market price of the stock fluctuated between $29.00 and $33.00 per share, with the average price being approximately $30.00.[5] Further-

more the letter was not filed with the Comptroller of Currency prior to mailing in accordance with 15 U.S.C. § 78n(d)(4),[6] 12 C.F.R. § 11.5(m)(1),[7] and 12 C.F.R. § 11.53.[8]

On March 22, 1973, the day following the publication of the amended tender offer, plaintiff filed suit.

### THE LAW

In 1968 a bill, in the form of amendments to the Security and Exchange Act, and introduced by Senator Williams of New Jersey, was adopted by the Congress. The purpose of the bill was to provide for the regulation of cash tender offers, primarily by requiring full and fair disclosure of the offer for the benefit of all interested parties. According to Senator Williams:

"The measure is not aimed at obstructing legitimate takeover bids. In some instances, a change in management will prove a welcome boon for shareholder[s] . . . and . . . it may be necessary if the company is to survive.

I have taken extreme care with this legislation to balance the scales equal-

---

5. In addition to the mailing of the March 12th letter, White and other directors and officers of the bank made purchases of bank shares at the offer price. However, the evidence did not reveal any manipulation of the price of the stock as alleged by plaintiff. In fact, according to the testimony of experts John J. Zollinger, Jr. and D. B. A. Chaffe, III the normal course of events following a tender offer for stock is for the market price to rise to meet the offer price. It appears that this was the case with regard to the bank stock in question.

6. 15 U.S.C. § 78n(d)(4) provides:
   (4) Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

7. 12 C.F.R. § 11.5(m)(1) provides in pertinent part:

(m) Recommendations as to tender offers. (1) No solicitation or recommendation to the holders of a security to accept or reject a tender offer or request or invitation for tenders subject to section 14(d) of the Act shall be made unless, at the time copies of the solicitation or recommendation are first published or sent or given to holders of the security, the person making such solicitation or recommendation has filed with the Comptroller a statement containing the information specified by Form F-12: Provided, however, That this paragraph shall not apply to (i) a person required by paragraph (1) of this section to file a statement, or (ii) a person, other than the bank or the management of the bank, who makes no written solicitations or recommendations other than solicitations or recommendations copies of which have otherwise been filed with the Comptroller.

8. 12 C.F.R. § 11.53 provides the form (F-12) which is required by 12 C.F.R. § 11.5(m)(1).

ly to protect . . . corporation, management, and shareholders . . . Every effort has been made to avoid tipping the balance of regulatory burden in favor of management or in favor of the offeror. The purpose of this bill is to require full and fair disclosure for the benefit of stockholders while at the same time providing the offerer and management equal opportunity to fairly present their case."

113 Cong.Rec. 854–855 (1967); 83 Harv.L.Rev. 377 "Cash Tender Offers" (1969).

In addition to regulating disclosure, both with regard to the offeror and to those persons who might seek to influence the shareholders to accept or reject the offer, and authorizing the promulgation of regulations to achieve those ends, the Williams Amendment prohibits the dissemination of any untrue or misleading information related to the tender offers regulated by the act. Section 14(e) of the act, 15 U.S.C. § 78n(e) provides:

"(e) It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations

define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative."

This provision is similar in wording and content to "Rule 10b–5" of the General Rules and Regulations of the Securities and Exchange Commission which were enacted pursuant to the Securities and Exchange Act of 1934. 17 C.F.R. § 240.10b–5.[9] Rule 10b–5 applies to the purchase and sale of securities and has been the subject of much litigation, which has served as a guide for the interpretation of the similar provision regarding tender offers. Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (C.2 1969); Chris Craft Industries, Inc. v. Bangor Punta Corp., 480 F.2d 341 (C.2, 1973).

A violation of Section 14(e), as the provision is popularly called, is found to have occurred when it is shown:

" . . . [that] there has been a material misstatement or omission concerned with a tender offer and when such misstatement or omission was sufficiently culpable to justify granting relief to the injured party. The key concepts in this formulation are *materiality* and *culpability* . . . In sum, and put as simply as possible, the standard for determining liability under § 14(e) on the part of a person making a misleading tender offer, or a responsible officer of a corporation making such an offer, is whether plaintiff has established that defendant either (1) knew the material facts that were misstated or omitted, or (2) failed or refused to ascer-

9. § 240.10b–5 Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate (sic) commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a

material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

tain such facts when they were available to him or could have been discovered by him with reasonable effort." Chris Craft Industries v. Bangor Punta, *supra*, 480 F.2d at 362.

Relief for violations of Section 14(e) is commonly requested during the pendency of the tender offer by means of injunction or other equitable relief. In many instances relief at this stage is preferable to letting an offer proven to be tainted in some way by a violation of the securities law expire, leaving only a suit for damages as a recourse to the injured party.

" . . . the application for preliminary injunction is the time when relief can best be given . . . Courts have a variety of tools usable at that stage. If the filings are defective or the tender offer misleading, the court can require correction, along, of course, with an opportunity to withdraw and an injunction against further solicitation until the period for withdrawal has expired." Electronic Specialty Co. v. International Controls, *supra*, 400 F.2d at 947.

■■ It is the duty of the Court in an equitable proceeding of this nature to consider the balance of equities in fashioning relief. In performing this function the Court should be cognizant that the purpose of regulation of tender offers is to provide protection, by prohibiting the transmission of misleading or false information, to the offeror, the target corporation, and to the corporation's shareholders, who must determine whether or not to tender their shares pursuant to the offer.

After applying the law to the facts in this matter, the Court reached the following conclusions:

■ (1) Applying the criteria of materiality and culpability, it is clear from the evidence that plaintiff violated the provisions of Section 14(e) by his failure to disclose his clear intent to control the bank and to remove certain bank officers, including Mr. White, from their positions.

■ A failure to disclose an intention to take control, to participate actively in management, or to change management is a violation of the disclosure rule. Gulf and Western Industries Inc. v. Great Atlantic and Pacific Tea Company, 476 F. 2d 687 (C.2, 1973). The fact that such results were not absolutely certain at the time of the original offer does not relieve a party from the duty to disclose these possibilities. Gulf and Western Industries v. Great Atlantic and Pacific Tea Co., *supra*.

In the present case Cauble clearly intended to obtain control of the bank and to make important changes in the bank's managerial personnel. These factors are material in the determination of a "reasonable shareholder" as to whether or not to tender his shares. The First National Bank of Jefferson is not a large bank, and its stockholders are primarily local people. It is extremely probable that knowledge of a management change or take-over bid would be most relevant in the decision as to whether or not to tender stock.

■ (2) The March 12, 1973 letter, sent by the bank president was a misleading attempt to deter shareholders from responding to plaintiff's tender offer. It should have been filed with the Comptroller of Currency prior to mailing in accordance with 15 U.S.C. § 78n(d)(4) and applicable regulations 12 C.F.R. § 11.5m(1) and 12 C.F.R. § 11.53. The letter itself was in violation of Section 14(e), having met the requirements of materiality and culpability.

"The concept of materiality focuses on the weightiness of the misstated or omitted fact in a reasonable investor's decision to buy or sell . . . whether a reasonable man would attach importance to the fact misrepresented in determining his choice of action in the transaction in question." Chris Craft Industries v. Bangor Punta Corp., *supra*, 480 F.2d at 362.

In the instant case, it is reasonable to assume that a shareholder could be deterred from tendering his stock at $41.-

00 per share in the face of a potential valuation of the same stock at $100.00 per share. The reliance that might be placed upon such a representation is greater than usual, due to the fact, as stated, that the bank is relatively small and its shareholders relatively localized and thus likely to rely upon Mr. White's representations.

■ The culpability of officers or directors of a corporation for misstatements is greater than that of other persons due to their position.

"Corporate officers and directors in their relations with shareholders owe a high fiduciary duty of honesty and fair dealing . . . By reason of the special relationship between them, shareholders are likely to rely heavily upon the representations of corporate insiders when the shareholders find themselves in the midst of a battle for control."

Chris Craft Industries v. Bangor Punta Corp., *supra*, 480 F.2d at 364.

Therefore, an officer of the target bank, having violated the provisions of Section 14(e), the protected rights of both shareholders and offeror have been violated, and correction of the misleading statement is required.

It was the opinion of the Court that both plaintiff and defendants should be required to correct their misleading statements. It is clear that following such corrections the shareholders who had previously tendered should be allowed to reassess the situation and to withdraw their shares if they should choose to do so.

For the foregoing reasons the Court issued the following order:

"Having determined from the testimony and evidence adduced at hearing on motions of both parties for a preliminary injunction that both plaintiff and defendants are in violation of 15 U.S.C. § 78n(e) governing conduct with respect to tender offers—plaintiff, due to his failure in his various F–11 statements of his offer to fully disclose his intent with regard to control and changes in management in the event that he should gain control, and defendants being in violation as a result of the misleading letter mailed to shareholders by the bank president without compliance with the regulations governing such communications, (12 C.F.R. § 11.5[m] and 12 C.F.R. 11.53)—and bearing in mind that it is the role of the Court in a proceeding of this nature to weigh the equities and to fashion such relief as is appropriate under the circumstances,

It is ordered:

1. Prior to the close of business on the day following the filing of this Order, W. Richard White shall transmit to all shareholders of the First National Bank of Jefferson the following letter:

'Dear Shareholder:

I am writing to you with reference to a letter which you received from me dated March 12, 1973, concerning a tender offer for 150,000 shares of stock in the First National Bank of Jefferson Parish by Mr. Rex C. Cauble. In that letter reference was made by me to a future valuation of First National Bank of Jefferson Parish stock at $100.00 per share. I wish to inform you at this time that this valuation has no factual basis insofar as I decided upon this valuation without any reference to or request for expert opinion on the subject of potential or actual value of stock.

You should not construe this letter, or my letter of March 12, 1973, as an attempt to influence you in any way as to the disposition of your stock.'

2. Thereafter, it is ordered that Mr. Rex C. Cauble file an amended F–11 form in accordance with the provisions of 15 U.S.C. § 78n(d)(1) which clearly and specifically delineates his intention to assume effective control of the bank and with regard to his present intention to seek the discharge of the president of the bank and possibly of other officers or other employees.

The filing of this amended statement definitive of the offeror's aims with ref-

erence to the bank shall be deemed to— and the amended tender offer shall so state—bring the provisions of 15 U.S.C. § 78n(d)(5) into effect, thereby allowing shareholders who have previously tendered shares pursuant to the original misleading tender offer an opportunity to reassess the tender offer in the light of the corrective actions of both the bank and the offeror pursuant to this Order and allow to any who so choose an opportunity to withdraw shares previously tendered for a period of seven days. Following the initial seven day period after the publication of the revised tender offer, the amended offer shall remain in force until 5:00 p. m. on Monday, April 23, 1973, after which time it will expire.

3. All other relief sought through the various motions of any party before the Court is denied.

Written reasons will follow.

New Orleans, La. this 5th day of April, 1973."

The game should be replayed with strict adherence by both sides to the rules.