CRANE CO., Plaintiff,

v.

HARSCO CORPORATION and Richard S. Gebelein, the Attorney General of the State of Delaware, Defendants,

and

HARSCO CORPORATION, Counterclaim Plaintiff,

v.

Thomas M. EVANS and Crane Co., Counterclaim Defendants.

Civ. A. No. 81–30.

United States District Court, D. Delaware.

Feb. 17, 1981.

---

R. Franklin Balotti, Donald A. Bussard and Samuel A. Nolen of Richards, Layton & Finger, Wilmington, Del., for plaintiff Crane Co.; Fried, Frank, Harris, Shriver & Jacobson, New York City, of counsel.

Michael D. Goldman, David B. Brown and Donald J. Wolfe, Jr. of Potter, Anderson & Corroon, Wilmington, Del., for defendant Harsco Corp.; Mudge, Rose, Guthrie & Alexander, New York City, of counsel.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

In this action, the Court must decide whether to enjoin consummation of a hostile tender offer. The target company, Harsco Corporation ("Harsco"), has moved for a preliminary injunction on the ground that the offeror, Crane Company ("Crane"), has violated federal securities laws in failing to make full disclosure to the shareholders. It further contends that the pending acquisition would contravene the antitrust laws. The Court finds these claims to be without merit, and denies the requested injunctive relief.

### I. *Factual Background*

Crane's efforts to increase its ownership of Harsco from less than five percent to twenty percent by means of a tender offer precipitated this litigation. On January 26, 1981, Crane instituted an action challenging the constitutionality of the Delaware Tender Offer Act, 8 Del.C. § 203, and immediately obtained a temporary restraining order enjoining Harsco and the Attorney General of the State of Delaware from taking any action under the Delaware Act to delay commencement of Crane's proposed tender offer. Crane simultaneously filed suit in the United States District Court for the Eastern District of Pennsylvania and obtained a similar order with regard to the Pennsylvania Takeover Disclosure Law. Crane's tender offer commenced on January 27, 1981, when Crane filed a Schedule 14D–1 with the Securities and Exchange Commission ("SEC"), and took steps to have the Offer to Purchase ("offer") mailed to Harsco stockholders. Under the terms of the tender offer, Crane seeks to acquire 1,600,000 additional shares of Harsco, which would constitute a 15% interest. If more than 1,600,000 shares are properly tendered prior to midnight on February 17, 1981, Crane will purchase 1,600,000 shares on a *pro rata* basis. The tender offer to buy expires at 10:00 A.M., February 25, 1981.

On January 29, 1981, Crane's motion of January 26, 1981 for a preliminary injunc-

tion was denied on the basis of Harsco's pledge to contest the constitutionality of the Delaware Act only in this Court.

The next phase began on February 4, 1981, when Harsco filed numerous counterclaims against Crane and its chief executive officer Thomas M. Evans. Harsco also moved for a preliminary injunction to prevent Crane and Evans[1] from proceeding with a tender offer for Harsco common stock, soliciting offers to buy Harsco common stock, exercising any of the rights of ownership of the Harsco common stock, exercising any influence or control over the business or management of Harsco, or disposing of its Harsco common stock. In its brief and at the preliminary injunction hearing on February 13, 1981, Harsco argued that consummation of the tender offer should be enjoined because of Crane's alleged failure to disclose certain material facts in its tender offer, in violation of the Williams Act, § 14(e) of the Securities Exchange Act of 1934, and because of alleged injury to competition that would result, in violation of § 7 of the Clayton Act.[2] At the hearing, Harsco limited its request for injunctive relief on the Securities Act claim to a stay of the tender offer process until Crane amends its Schedule 14D–1 and offer to include the alleged undisclosed material facts. With respect to the antitrust claims, Harsco seeks preliminary and permanent injunctive relief. This Court has jurisdiction under § 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, § 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337.

## II. Standards for Preliminary Relief

In deciding whether to grant a preliminary injunction, the Court must consider four factors:

1) whether the movant has made a showing of reasonable likelihood of success on the merits;

2) whether the movant has shown that, absent such relief, it would be irreparably injured;

3) whether other parties interested in the proceedings would be substantially harmed by grant of the injunction; and

4) whether the public interest would be served by granting the relief sought. *A. O. Smith Corp. v. F.T.C.*, 530 F.2d 515 (3d Cir. 1976).

There is a conflict among the courts as to whether irreparable injury would result if a tender offer is not enjoined, where failure to make all required disclosures, and likelihood of anticompetitive effect are alleged. Some courts consider preliminary injunctive relief prior to the consummation of a tender offer as a useful remedy, on the view that the difficulty in "unscrambling the eggs" following consummation will likely prevent adequate relief. *See, e. g., Ronson Corporation v. Liquifin Aktiengesellschaft*, 483 F.2d 846, 851 (3d Cir. 1976), *citing Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir. 1973); *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 947 (2d Cir. 1969). However, where the tender offer is for a minority share of the stock, other courts have concluded that no omelette was in the making and have found that there would be no irreparable injury if the tender offer were consummated. *See, e. g., Pullman Inc. v. J. Ray McDermott & Co.*, No. 80C 3555 (N.D.Ill. July 31, 1980). Since the question of irreparable injury need not be addressed if the motion can be disposed of on the issue of probable success on the merits, *see, e. g., Missouri Portland Cement Co. v. H. K. Porter Co.*, 406 F.Supp. 984 (E.D.Mo.1975), *aff'd*, 535 F.2d 388 (8th Cir. 1976), this Court will forbear deciding whether Harsco has shown irreparable injury.

## III. Alleged Securities Law Violations

Harsco charges that Crane has violated the Williams Act, § 14(e) of the Securities

---

1. The Court will adopt the parties' usage of "Crane" to refer to both Crane and Evans.

2. At the hearing, Harsco specified that it was not seeking preliminary relief on the basis of its other counterclaims, including alleged violation of the Delaware Tender Offer Act, although it has preserved these claims for trial on the merits.

Exchange Act,[3] which was intended to insure full and fair disclosure to shareholders so that they could make informed decisions as to the tender offer confronting them. *Piper v. Chris-Craft Industries*, 430 U.S. 1, 35–39, 97 S.Ct. 926, 946–948, 51 L.Ed.2d 124 (1977). Harsco alleges that Crane has violated § 14(e) by misrepresenting or omitting the following material information:

a) Crane's intention to control or participate extensively in Harsco's management;

b) the significant influence over the management of Harsco which Crane will obtain upon acquiring 20% of Harsco common stock;

c) a list of prior Crane investments in which Crane either obtained control or sold at a profit;

d) Crane's access to confidential Harsco information and retention of former Harsco counsel in the initial stages of this action; and

e) the antitrust problems raised by Crane's acquisition of a 20% interest in Harsco.

The Court holds that these allegations of nondisclosure concern statements which either have not been proved or are immaterial and thus do not establish a violation of Section 14(e) of the Securities and Exchange Act.

### A. *Misrepresentation of Intention*

Harsco's principal claim is that Crane misrepresented Crane's intention by stating that the purpose of the offer was "to substantially increase its investment" in Harsco and by stating that it had no "current intention" to seek control of Harsco or representation on Harsco's Board of Directors. Offer of Purchase at 13, Exhibit 1, T. Evans Dep. Harsco asserts that the acquisition record of Crane and Evans, as well as the implausibility of purchasing a 20% interest solely as an investment belies this statement of purpose and reveals Crane's intention either to acquire control or to give the appearance of seeking control as a means of attracting a profitable counter-offer for this large block of stock.

■ In order to establish this claim Harsco cannot rely on the probability that Crane's stated intentions will change in the future, but must prove that Crane's offer is motivated by present plans, which should be disclosed. Not only are offerors not "required to make predictions of future behavior," *Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d 1075, 1086 (5th Cir. 1970), they need not "disclose those plans or designs which are necessarily contingent or indefinite," *Missouri Portland Cement Co. v. H. K. Porter & Co., supra* at 987 (regarding proposed merger plans). In holding that prior merger negotiations were not adequate evidence of a continuing intention to merge which an offeror must disclose, Judge Friendly declared that "[i]t would be as serious an infringement of [the Williams Act] to overstate the definiteness of the plans as to understate them." *Electronic Specialty Co. v. International Controls Corp., supra* at 948. Although courts have been willing to find that purchasers intended to obtain control in acquiring a minority block of shares, despite the purchasers' disavowals, in each case some evidence of intent has generally been adduced. *See, e. g., Gulf & Western Indus., Inc. v. Great A. & P. Tea Co., Inc.*, 476 F.2d 687 (2d Cir. 1973) (offeror stated that his management team could improve target's business prospects); *Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d 240 (8th Cir. 1979) (offeror sought representation on target's board of directors).

---

**3.** Section 14(e) provides:

[i]t shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative. 15 U.S.C. § 78n(e).

■ Harsco bases its view that Crane seeks control on the history of stock acquisitions by Evans or an Evans-controlled company. In several cases, those acquisitions were stated to be for investment only, but were followed rapidly by further acquisitions of stock and assumption of control. Harsco also cites the "Summary of Recent Investment," Exhibit 2, Donaldson Dep., which was provided the Crane Board of Directors at the January 26, 1981 meeting during which the tender offer was approved. This "track record" listed ten companies, including five in which Crane had either attempted to gain control or successfully gained control. As Harsco acknowledges, however, these acquisitions records serve only to suggest Crane's possible intentions. Harsco Brief at 9.

Harsco attempts to derive proof of Crane's intent from the circumstances of Crane's growing interest in Harsco. However, whether as a result of innocence or sophistication, all of Crane's officers or directors or employees have demonstrated absolute ignorance of any intention of Crane with regard to Harsco beyond investment. Harsco argues that the amount of discussion of the tender offer plan by the Board is indicative of Crane's intent; yet, the brevity of the Board's consideration of the acquisition no more suggests an intent to control than merely a plan to invest. Harsco also urges that the Board's approval of a significant expansion of a subsidiary's capacity for tubular goods manufacture, at a November, 1980 meeting, is clearly tied to the tender offer for Harsco stock, in that Harsco produces a component used in making these goods. *See* pp. 123–124, *infra.* The time sequence does not establish a causal relation, however, nor prove Crane's purpose in making the tender offer.

Finally, Harsco contends that it is economically illogical for Crane to expend over $60 million for investment only. Given Crane's liquidity, Harsco's suspicion has no probative force. Harsco also questions Crane's avowed indifference to the use of equity accounting with regard to Harsco stock; Harsco argues that if cost accounting were used, the Harsco stock acquisition would have a negative effect on Crane's earnings, since the carrying charges on its investment would exceed Harsco's dividends. Harsco infers that Crane is reluctant to admit its intention to use equity accounting because such "connotes" a significant degree of control over the subject corporation and thus would reveal Crane's intention to exercise control over Harsco. No such conclusion is possible. The hesitancy of Crane's officers as to the use of equity accounting is consistent with the ambiguity inherent in Accounting Principles Board (APB) Statement No. 8, the rule promulgated by the Financial Accounting Standards Board ("FASB") as to the use of equity accounting for investments in common stock. Although the FASB has attempted to link the use of equity accounting to the exercise of some control over the investee, which would make the inclusion of the investor's share of the earnings or losses in its own financial statements appropriate, *see* APB Statement No. 8 at 353, its formulation of the test of control must and does leave room for interpretation. Equity accounting is to be used "by an investor whose investment in voting stock gives it the ability to exercise significant influence over operating and financial policies of an investee." *Id.* at 355. Recognizing the quandary in which this definition leaves the investor, the FASB has also prescribed that 20% ownership "should lead to a presumption that in the absence of evidence to the contrary an investor has the ability to exercise significant influence." *Id.* While this might appear to clarify the situation, it does not eliminate the confusion regarding a 20% owner which does not exercise control although it has the ability to do so. This confusion explains the response of Crane management, as well as the ambivalence in Crane's offer as to the future use of equity accounting. The evidence regarding equity accounting thus proves nothing.

In conclusion, the intimations of control which Harsco has perceived do not prove that Crane has any present intention, whether vague or definite, to take control of Harsco.

## B. *Failure to Disclose Ability to Exert Significant Influence*

■ Harsco contends that Crane's offer fails to disclose that the acquisition of 20% of Harsco common stock will enable Crane to exert significant influence over the management of Harsco. This claim is apparently based on APB Opinion No. 18, *supra*, which states that 20% ownership "should lead to a presumption that in the absence of evidence to the contrary an investor has the ability to exercise significant influence over an investee." *Id.* at 355. This presumption is rebuttable, and therefore does not rise to the level of a material fact, as applied to a particular offeror and acquisition.

## C. *Failure to Disclose Past Completed or Attempted Acquisitions*

■ Harsco argues that Crane should have disclosed in its Offer of Purchase the list of prior Crane investments presented to the Crane Board of Directors at the January 26, 1981 meeting. The Supreme Court set out the standard of materiality to be applied to Schedule 14D–1 filings in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976):

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

Harsco argues that because this list was presented to the Board during the discussion of the Harsco tender offer, Crane management deemed it relevant, and concludes that it would therefore be material to Harsco stockholders. Although the testimony as to the use of this list at the Board meeting is rather evasive, *see, e. g.,* Slater Dep. at 23, R.S. Evans Dep. at 47, the list at most suggests Crane's possible future action regarding Harsco. As such, its inclusion would not be viewed by the reasonable investor as having significantly altered the "total mix" of information available. Further, since Harsco has not alleged that the fact that the list was presented at the Board meeting should have been disclosed, mere transcription of the past history of Crane's acquisition activity does not transform the nature of information. Such information has in the past been held not material:

> A tender offeror is not obligated to disclose ... a past policy to liquidate or sell the assets of the target company.... Nor is a failure to disclose such a past policy an omission of a material fact or a misleading statement under 15 U.S.C. § 78n(e) [section 14(e) of the Williams Act].

*Missouri Portland Cement Co. v. H. K. Porter Co., Inc.*, 535 F.2d 388, 397 (8th Cir. 1976); *accord, Sea World, Inc. v. MCA, Inc.*, [1976–77] *Fed.Sec.L.Rep.* (CCH) ¶ 95,803 (S.D.Cal.1976).

## D. *Failure to Disclose Crane's Access to Confidential Harsco Information and Retention of Harsco Counsel*

■ The record reveals that in early January 1981, Crane obtained certain information from a Vice President of Harsco's Capitol Manufacturing Division, Gene G. Lamone, as to the market shares and production of manufacturers of couplings meeting the standards of the American Petroleum Institute (API). There is some dispute as to whether Crane knew that this information was confidential, and it is even unclear what portion was in fact confidential. Harsco nevertheless charges that Crane's receipt of the information is a material fact which Crane should have disclosed to Harsco stockholders. Although this transmittal of information could lend support to a num-

ber of hypotheses, a reasonable investor is unlikely to consider it important in making his investment decision.

Harsco also alleges that Crane has failed to disclose in amendments to its Schedule 14D-1 that the Delaware counsel originally retained to prosecute this action on Crane's behalf withdrew following Harsco's motion to disqualify them on the basis of their access to confidential information regarding Harsco, a former client. The use to which a reasonable stockholder is to put this information remains entirely unclear to the Court. Thus, this fact also cannot be regarded as material.

### E. Failure to Disclose Antitrust Problems

■ Finally, Harsco alleges that Crane's tender offer violated Section 14(e) in failing to disclose the antitrust problems raised by its acquisition of a 20% interest in Harsco. An offeror is required to make such disclosures only where circumstances concerning the companies' positions, or market conditions, "were such as to make the probability of antitrust violations *clearly apparent* at the time of the offer." *Missouri Portland Cement Co. v. Cargill Co.*, 375 F.Supp. 249, 268 (S.D.N.Y.) (emphasis added), *aff'd in relevant part*, 498 F.2d 851, 572 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974). Although the existence of circumstances raising serious antitrust problems would be a material fact to be disclosed in the tender offer, *see Elco Corp. v. Microdot, Inc.*, 360 F.Supp. 741, 752–53 (D.Del.1973); *Gulf & Western Indus., Inc. v. Great A. & P. Tea Co.*, *supra* at 697, in light of the Court's conclusions as to the antitrust violations implicit in consummation of this tender offer, *see* pp. 122–126, *supra*, no such disclosure of potential problems was required here.

### IV. Alleged Antitrust Violations

■ The second ground on which Harsco seeks to have the consummation of the tender offer enjoined is that the stock purchase would violate § 7 of the Clayton Act, 15 U.S.C. § 18. Section 7 prohibits acquisi-

tion by one corporation of part or all of another corporation's stock, "where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition...." *Id.* Because § 7 was intended to eliminate substantial threats to competition in their incipiency, the Court must attempt to determine the future impact of Crane's acquisition of a 20% interest in Harsco on competition in any line of commerce. *See United States v. Philadelphia National Bank*, 374 U.S. 321, 362, 83 S.Ct. 1715, 1740, 10 L.Ed.2d 915 (1963).

There is a threshold question to be addressed, however. Section 7 provides that it does not apply to "corporations purchasing such stock solely for investment." 15 U.S.C. § 18. Crane urges that its tender offer comes within this "investment exception," and that the antitrust inquiry must end there. Though the Court has found that the purpose of Crane's tender offer was not to obtain control, *see* p. 120, *supra*, it does not follow necessarily that the stock acquisition comes within the investment exception. As the Supreme Court has stated, "[i]mmunity from the antitrust laws is not lightly implied." *California v. Federal Power Commission*, 369 U.S. 482, 485, 82 S.Ct. 901, 903, 8 L.Ed.2d 54 (1962).

It is a vexed question in antitrust law whether an acquisition "solely for investment" should be permitted under § 7 if there is a substantial likelihood of anticompetitive consequences. Nearly fifty years ago, the Third Circuit suggested in dictum that such an acquisition would be permissible, *see Pennsylvania Railroad Co. v. ICC*, 66 F.2d 37, 40 (3d Cir. 1933), *aff'd mem. by an equally divided court*, 291 U.S. 651, 54 S.Ct. 559, 78 L.Ed. 1045 (1934). More recently, however, courts have taken a sharper view of the exception, at the risk of reading it out of the statute. *See* 5 P. Areeda and D. Turner, *Antitrust Law* ¶ 1204 (1980). The Second Circuit reads the *Pennsylvania Railroad* decision as standing for the proposition that "the court's attention should be focused less on whether the purchase constitutes an 'investment' than

on whether the effect ... is substantially to lessen competition." *Gulf & Western Industries, Inc. v. Great A. & P. Tea Co., Inc., supra* at 693. In the *Gulf & Western* case, the Second Circuit went on to enjoin consummation of a tender offer in part because of the likelihood of substantial anticompetitive effect.[4] *Id.* at 694–695.

In the Court's view, there is a gray zone between acquisitions for investment, where there is no possibility of influence or control over the firm whose stock is purchased, and acquisitions where the aim is control. Though the offeror's avowed purpose may be investment, where the interest sought to be acquired is sufficiently large that influence or control is a realistic possibility, the Court is constrained to consider the potential anticompetitive effects of the acquisition. Insofar as § 7 requires courts to look to future effect, *see United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 589, 77 S.Ct. 872, 875, 1 L.Ed.2d 1057 (1957), the Court will not exempt from antitrust scrutiny an acquisition which may give the offeror the power to influence the target's management.[5]

The issue controlling the applicability of the investment exemption, then, is the likelihood that the acquisition would allow the offeror to influence significantly or control management of the target firm. In the instant case, Crane's interest in Harsco will be slightly larger than 20%. The Court holds that there is a substantial likelihood that with a 20% interest, Crane may have significant influence over Harsco. *See, e. g., Gulf & Western, supra* at 694–95 (19% block sufficient to give offeror "substantial advantage" over competitors in dealing with target firm); *Dan River, Inc. v. Unitex, Ltd.*, 624 F.2d 1216, 1225 (4th Cir. 1980) (20% block "frequently regarded as control"); APB Opinion No. 18, *supra* (presumption of control if firm owns 20% of

another firm's stock). The Court will therefore consider the likely effect of Crane's acquisition on competition in the relevant lines of commerce.

The effect of the stock acquisition on competition must be analyzed with regard to the acquisition's horizontal and vertical aspects. Harsco contends that there will be "horizontal injury" to competition insofar as a subsidiary of Crane, C F & I Steel Corporation ("C F & I"), and a division of Harsco, Capitol Manufacturing Company ("Capitol"), are competitors in the coupling market. Harsco also argues that there will be "vertical injury" to competition, because C F & I might require Capitol to buy from C F & I the compiling stock from which Capitol manufactures couplings, and might foreclose Capitol from supplying other buyers with couplings. Finally, Harsco suggests that the acquisition would, by foreclosure and disclosure, lessen competition in the market for metal recovery services, in which Heckett, another Harsco division, competes. Each of these allegations will be considered in turn.

### A. Horizontal Effects of the Acquisition

In considering a § 7 claim, the Court must, as a preliminary matter, define the relevant product and geographic markets. The parties have stipulated that the product market relevant to this claim is the market for API couplings. A "coupling" is a short piece of pipe threaded on the inside at each end, used to join two other pieces of pipe; an "API coupling" is a coupling built to meet standards established by the American Petroleum Institute for pipe used in the oil and gas industry. Though Harsco contends that the geographic market "could be" defined as the "oil country," the western United States, it offered no support for that position. *See Harsco Brief* at 29. Moreover, both parties gave market data

---

4. Unlike in the instant case, the Court found that the offeror intended to gain control or significant influence over the target by the acquisition. 476 F.2d at 697.

5. This conclusion can be reconciled with the finding that the offeror did not misrepresent

the purpose of the offer, *see* p. 121, *supra,* on the ground that § 7 requires the Court to anticipate future developments, whereas the issue under § 14(e) must be decided on the basis of the evidence in the record as to the offeror's current intentions.

only for the national coupling market. Thus, the Court finds that the national market is the relevant geographic market.

Harsco contends that because C F & I and Capitol both fabricate API couplings, Crane's acquisition of an interest in Harsco will substantially lessen competition in the national market for API couplings. The coupling industry is comprised of independent fabricators, who make couplings to sell to manufacturers of tubular pipe, and steel companies who fabricate couplings "in house" for use in making tubular steel pipe. Capitol is an independent fabricator, while C F & I is a steel company that produces tubular pipe.

The Court must first decide, for purposes of this analysis, whether Capitol and C F & I should be regarded as competitors in the coupling market. Couplings are not an end product; they are a component in the manufacture of steel pipe. Whereas Capitol supplies a number of pipe manufacturers with couplings, C F & I uses all the couplings it makes in its own steel pipe production. It is difficult for the Court to ascertain how competition would be affected on the horizontal level even if C F & I gained control of Capitol, so long as Capitol continued to sell its output on the market. Clearly, the number of fabricators competing for the orders of pipe manufacturers would not have changed.[6]

Because C F & I sells no couplings on the open market, and dollar sales is the traditional measure of market share, C F & I would generally not be viewed as a competitor in the coupling market. In an effort to bring C F & I within the market, Harsco argues that capacity rather than sales should be used as the measure in this case. Courts have generally relied on capacity figures only where the structure of the industry or special practices suggest that market share calculations based on sales figures would be misleading in assessing the impact of a merger. See, e. g., United States v. Amax, Inc., 402 F.Supp. 956, 961 (D.Conn.1975). No reason was given in the instant case why market shares should not be determined on the basis of sales.

Even if Capitol and C F & I are viewed as competitors, and market share is computed on a capacity basis, Harsco still failed to carry its burden of showing that the probable effect of Crane's stock acquisition would be to lessen competition substantially in the API coupling market. Harsco offered only the sketchiest evidence as to C F & I's market share. Though Harsco stated that C F & I produces roughly 6% of all API couplings made, see Harsco Brief at 28, that "estimate" finds no support in the record. Accepting arguendo the working figures of the Capitol employee, Gene Lamone, who prepared Harsco's market share analysis, those figures indicate that C F & I's share of the couplings production is less than 5%.[7] In markets such as the API coupling market that are not highly concentrated, see Note 6, supra, the Department of Justice does not oppose mergers or acquisitions where the acquiring firm has a market share of less than 5%, on the ground that

---

**6.** While C F & I might be a "perceived potential entrant" in the coupling market, the market is not sufficiently concentrated to enjoin the acquisition simply because it eliminates a source of potential competition. The Supreme Court has applied the "potential entrant" doctrine only to markets that are already highly concentrated, see United States v. Marine Bancorporation, Inc., 418 U.S. 602, 630–31, 94 S.Ct. 2856, 2874–75, 41 L.Ed.2d 978 (1974). The four largest producers of API couplings account for 64% of the total production, and thus the market is not highly concentrated. See Department of Justice Merger Guidelines ("Merger Guidelines") in 3 Von Kalinowski, Antitrust Laws and Trade Regulation ¶ App. 1C–109 (1980). Moreover, the trend in the industry has been toward less concentration. See pp. 125–126, infra.

**7.** According to Lamone's figures, the sales figure corresponding to C F & I's 1980 output would be $8–$10 million. See Exhibit 3, Lamone Dep. Leaving aside the valuation problem, that would be, at most, between 3.9% and 4.8% of the total volume of API coupling sales in 1980, which Lamone estimated to be at least $207 million. See Lamone Dep. at 51–52. At oral argument, Crane disputed Harsco's "estimate" of 6%. The support offered for the figure is grossly inadequate in the Court's view. Harsco failed to elicit data confirming it either in depositions or interrogatories.

the anticompetitive effect is not substantial. *See* Merger Guidelines, *supra* Note 6. Though these guidelines are not binding on the courts, they are often paid some deference. *See United States v. Hammermill Paper Co.*, 429 F.Supp. 1271, 1280–81 (W.D. Pa.1977).

The trend toward decreasing concentration in the coupling industry, and the apparent absence of significant barriers to entry, are further reasons why the Crane acquisition is unlikely to lessen competition substantially. In 1980, twenty-two new firms entered the coupling industry, and jointly accounted for some $40–$50 million in sales, between 15% and 19% of total sales. *See* Exhibit 2, Lamone Dep. Though there was some dispute in the record as to whether entry into the coupling industry is difficult, *compare* Slater Dep. at 110 ("inexpensive" to enter market) *with* Lamone Dep. at 83–84 ("great deal of investment" required), in the face of these facts, the Court finds that there are no significant barriers to entry. Consequently, any lessening of competition that might result from the stock acquisition will be less substantial than it would be if barriers were not low. *See* 4 *P. Areeda & D. Turner, Antitrust Law* ¶ 917b (1980). Therefore, the Court finds that the acquisition is unlikely to have any substantial detrimental effect on competition in the coupling industry.

## B. *Vertical Effects of the Acquisition*

Harsco alleges that four distinct instances of "vertical injury" will result from the stock acquisition, two in connection with Capitol and two with Heckett. The most serious is the claim that Crane, after acquiring the 20% interest in Harsco, will use its influence to make Capitol a "captive" source of supply for C F & I, foreclosing other tubular pipe manufacturers from buying couplings from Capitol. While Crane has made no mention of a requirements contract between Capitol and C F & I, this is hardly a remote possibility in view of Crane's expressed interest in Capitol's output and sales figures. *See* p. 121, *supra.* Thus, in view of the forward-looking character of § 7, the Court must consider the possible effect on competition.

It is clear that vertical foreclosure may lessen competition in the market of the sellers or buyers who are foreclosed. The issue for purposes of § 7 is whether the potential lessening of competition is "substantial." C F & I accounted for roughly 7% of the domestic sales of API tubular pipe in 1979, and presumably for 7% of the total "consumption" of API couplings. Capitol, on the other hand, accounted for 8.8% of API coupling production. Under the Justice Department guidelines for vertical mergers, a merger will be challenged if the supplying firm accounts for 10% or more of total sales, and the purchasing firm accounts for 6% or more of total purchases. *See* Merger Guidelines, *supra* Note 6. Therefore, this stock acquisition is not prohibited under the guidelines. There is no basis in the record for finding that a substantial lessening of competition would be likely. As the Supreme Court has stated, "[r]emote possibilities do not satisfy the test set forth in § 7." *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 623 n. 22, 94 S.Ct. 2856, 2870 n. 22, 41 L.Ed.2d 978 (1974), *quoting United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 555, 93 S.Ct. 1096, 1112, 35 L.Ed.2d 475 (1973).

One factor complicating the question of market shares is the fact that Crane has already approved plans for expanding C F & I's capacity for tubular pipe production. *See* Fabiani Dep. at 5. Harsco argues that C F & I's market share will increase as a result of this expansion, and that the Court should consider this in assessing the likelihood of injury to competition. Given that demand for API tubular pipe is high at present, a number of producers are probably planning to expand. Thus, the Court is unable to assess the effect that expansion will have on C F & I's market share. Under the circumstances, the Court holds that it would be too speculative to try to forecast future market shares; any showing of probable injury to competition must be made on the basis of current market share data. *See United States v. Amax, Inc., supra* at 960.

Harsco also alleges that C F & I may foreclose steel producers who supply Capitol with the compiling stock from which it manufactures API couplings from selling to Capitol. Again, there is no evidence in the record that C F & I, the supplier in this instance, has the 10% market share necessary to bring the acquisition within the guidelines for vertical mergers. *See* Blair Dep. at 21 (C F & I produced 7% of tubular pipe). Any substantial effect on competition is unlikely.

The claims concerning Heckett, another Harsco subsidiary, are different in character. Heckett is a service company which, operating under long-term contracts with steel companies, recovers metal from steel slag. Heckett conducts operations at its clients' mill sites, in fixed facilities. *See* Burdge Dep. at 197. Because of the nature of its services, Heckett is in possession of proprietary information from a number of steel manufacturers, and Heckett's business success depends on its clients' trust that such trade secrets will be kept in strictest confidence. In 1980, Heckett had 35% of the market in metal recovery services for steel producers. *See* Harsco's Answer to Interrogatory No. 9.

Harsco contends that Heckett's clients may take their business elsewhere if Crane is permitted to acquire a 20% interest in Heckett's parent firm, for fear that trade secrets in Heckett's possession would be disclosed to C F & I, a competing steel producer. The alleged injury is speculative at best. In discussing this potential problem, Harsco's president stated only that it was "conceivable" that Heckett's clients would have doubts about Heckett's "continued use of discretion" if Crane acquires the interest it seeks in Harsco. Burdge Dep. at 200. There is no indication in the record that any of Heckett's customers has voiced concern over the tender offer. This is in marked contrast to a number of Capitol's customers who have indicated concern over how Crane's interest in Harsco might affect their supply of couplings from Capitol. *See* Lamone Dep. at 116. Moreover, Harsco itself was in the steel-making business in a modest way for·a number of years after acquiring Heckett, *see* Burdge Dep. at 211,

and Heckett's position was apparently not compromised. These considerations lead the Court to conclude that the alleged injury to competition in the metal recovery services market is too remote to satisfy the requirements of § 7. *Cf. Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 584 F.2d 1195, 1205 (2d Cir. 1978) (possible access to proprietary information held no basis for barring partial take-over).

Finally, Harsco alleges that if Crane is permitted to acquire the 20% interest in Harsco, C F & I might foreclose other steel companies from purchasing Heckett's services. In view of Heckett's annual volume of sales, and the size of its clients, which include U.S. Steel and Republic Steel, this claim is implausible. Moreover, any withdrawal of services from long-standing customers would require Heckett to abandon fixed facilities at its clients' mills. Even assuming Crane had the ability to foreclose Heckett's customers, it is difficult to understand why it would seek to destroy the market position of a profitable Harsco subsidiary. The Court finds no substantial lessening of competition likely to result either among metal recovery firms, or among steel producers.

Therefore, the Court holds that the stock acquisition is unlikely to have any substantial anticompetitive effect, either at a horizontal or vertical level, even if it is assumed that the acquisition will allow Crane to influence or control Harsco.

## V. *Conclusion*

For the reasons stated above, Harsco has failed to establish a reasonable likelihood of success on the merits of its claims of violation of § 14(e) of the Securities Exchange Act and § 7 of the Clayton Act. Preliminary injunctive relief is therefore denied. This Opinion shall constitute the Court's Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.